Okay, Mr. Bacon. Good morning, Your Honors. My name is Tom Bacon. I represent the Plaintiff Appellant Dennis Haynes. Mr. Haynes is a vision-impaired individual and filed this action pursuant to Title III of the Americans with Disabilities Act. Defendant Appellee owns and operates a chain of Hooters restaurants. The basis of our complaint is that Hooters website is not compatible with screen reader software and therefore discriminates against vision-impaired disabled individuals. The defendant doesn't contend that its website is compliant. Instead, it filed a motion to dismiss, arguing that it had been sued previously in the case of Gomez v. Hooters by another disabled individual and entered into a settlement agreement. According to Hooters, pursuant to that settlement agreement, it plans to bring the website into compliance, at least with that agreement. The district court dismissed plaintiff's claims as moot and held that while it's true that plaintiff cannot be bound by the Gomez settlement agreement, it effectively held that agreement against our client. We're up to date on that. You need to make your arguments. In going over the arguments of our briefing, I'll incorporate the three cases that this case referred in its public announcement. Two of those cases are consistent with our arguments and the third one is distinguishable. Our first point is that what relief could a court supply, what redress could a court supply here that effectively you haven't already gotten? Hooters has already abandoned the website and started down the road of putting in a new one to correct the problem. That's really what you wanted, right? Yes. First, the worst... So you'd have the judge say, in this case, they got to do here what they've already agreed to do there? I would disagree. Well, two of the cases cited by this court... No, but just tell me what relief. What I want you to help me with is district judge has to fashion relief for the claim that you make. Strikes me the relief that you want is the relief that's already provided admittedly in a different case with different parties. Is that right or wrong? It's wrong. Okay, tell me why. Different. First of all, we seek actual compliance with the WCAG 2.0. Why in your answer you want an injunction and there is no injunction in the other case? Well, the other case involved a private sodom agreement which our party... I'm sorry. Why isn't your argument that you want and are entitled to an injunction and there is no injunction in the other case? Well, we do. We do seek an injunction. The question is whether the prior sodom agreement with another plaintiff that was not adopted by that court, not pursuant to a consent decree, can preclude our party's rights, our client's rights. Also, the relief... Rights to what? The rights... Do an injunction giving you the relief that you seek that you say you are entitled to under the act. You're not just entitled to have them do that. You're entitled to have a court order them to do that if they haven't already done it and everybody agrees they haven't already done it. Why isn't it that simple? It is that simple. We seek injunctive relief to bring the website into compliance with the WCAG which is the recognized industry standard. We seek to have the defendant continue to maintain its website in compliance with that standard. We seek an agreement... We seek not an agreement but an injunction that the plaintiff can enforce subsequently if the defendant doesn't comply rather than have to rely on a prior, another disabled person to enforce his rights under a confidential settlement agreement in which that court didn't even retain jurisdiction to enforce. You say it was confidential. Wasn't that not unsealed? Just help me with the record here. Don't we now know what the settlement agreement was in case one, Legoma's case? It was filed... There's no dispute, right? No, there's no dispute. It was filed in this case in the court below. Okay, so there's nothing confidential about it any longer? No longer. But it was never filed in the original Gomez case, nor did the court... Which doesn't really matter. The parties didn't even request that the court retain jurisdiction to enforce it. So it would be extremely difficult to enforce. They would have to go to state... Well, you have no remedy. You can't enforce anything. No, we can't... If Hooters backs out, you're stuck. If Hooters backs out... His remedy is you're stuck. Not only that... Well, agreed. But not only that, but the prior Sodom agreement expires this September. So after September of this year, Hooters... Let me ask you this question from the record evidence that was presented in this case before Judge Scola. Was there not record evidence that pursuant to that agreement in the other case, Hooters had already taken substantial steps to remediate the problem? We dispute that. Hooters doesn't contend that its website is compliant. It states that it planned... Well, it doesn't. It wouldn't happen overnight. They took the original website off and they're starting with a new one. And I thought that they took substantial steps toward the completion of that product. It's just that it wasn't complete yet. Have I misunderstood that? To my knowledge, they haven't complied. No, no, no. I understand there hasn't been a complete resolution of the problem. That's not my question. Was there not evidence in this case that Hooters had substantially gone down the road to remediate the problem? Hooters submitted... I believe Hooters submitted an affidavit to that effect. Was that disputed? I believe it was. I don't recall. What does substantial steps mean? Did they say, we've done this, we've done that, we've paid for it, IT people hadn't gotten around to it yet, it's impossible to do... What did they say the problem was? You're talking about a promise to do it, an agreement to do it in September 30, 2016. It's been a year and a half. What did they say the problem was in that affidavit? I don't recall. I didn't review the affidavit in preparation for this hearing. You should have. I should have. You're responsible for knowing everything in this record. If you don't, I don't see how you can do your job as an oral advocate. I apologize. I mean, was it not important enough to you? Well, the settlement agreement in that case didn't actually require that the defendant comply. I'm not talking about the settlement agreement in that case. I'm talking about the record in this case, which is rather slim. It's not that big a record. Yes, I apologize to the court. I will have to rely on your opposing counsel. Let me tell you why I raised the question. When I looked at Judge Scola's order, granting the motion to dismiss on mootness grounds, he says the following, the court's view of the status of Hooter's remedial efforts, however, differs from Haines' characterization. Here Hooter's agreement for ADA compliance was already in effect before Haines filed his suit. This plan is in accordance with a binding settlement agreement entered into as a result of the Gomez litigation. Haines does not dispute that Hooter's is in compliance with its obligations under the question and that Hooter's has already complied with the first phase of the remediation. I'm not sure I know what that means and I'm not sure I know whether or what record evidence supports it, but the district court seems to be finding that Hooter's compliance included the completion of the first phase of remediation, suggesting to me that they took some steps, although they weren't necessarily complete. What's that first step toward remediation and what record evidence is there? Well, that would be paragraph five of the settlement agreement, which simply states, within six months from the date of this agreement, which was September of 2016, the defendant shall include an accessibility notice on its website. That's the first phase. The second phase wasn't ... So the first phase was ... but how do we know that that was actually accomplished? A notice. I believe Hooter's stated it ... But there was a notice submitted in the Gomez case that was filed as part of the record evidence in this case? I mean, is that what ... I'm just looking for you to help me factually with what happened here. That would be a notice on its website. That's what the district court here is making reference to in the first step to remediation? I believe so. The second phase wasn't required until after the district court had already ruled. The second phase was that in September of 2017, Hooter's would bring its website into compliance with the agreement. But the agreement doesn't require actual compliance with WCAG. It simply says that it requires that Hooter's improve the accessibility of its website and contains equivocations which are vague and illusory, such as unless such action would fundamentally alter the nature of good services, facilities, privileges, advantages, or accommodations being offered, or would result in an undue burden. This borrows some language from other parts of the statute that aren't even arguably applicable to websites which were constructed many years after the act became effective. That would be in paragraph six. So there's nothing in the agreement that requires that Hooter's actually comply with the WCAG. Just simply that it shall vaguely improve accessibility of the U.S. portion of its website. That's paragraph six. I'm sorry, five. I misunderstood it. Yes, the action below, the Gomez action, was not a certified class action. If Hooter's had wanted to preclude the rights of unrelated third parties, then it should have employed the federal rules of civil procedure for class actions. In Taylor v. Sturgill, the Supreme Court stated that when there's no class action certification, that non-party exclusion is only warranted in limited circumstances. It warned that an expansive virtual representation doctrine would recognize a common law kind of shorn of class action protections. In the case below, the Gomez court didn't even retain jurisdiction. Let me ask a different question. Hooter's ever come in in this case and say to you, we'll settle this case, same terms, we settle Gomez?  Hooter's submitted our email in the offer of compromise to the district court. And that was essentially, our offer of compromise formed a basis for the district court's opinion that the Hooter's settlement agreement essentially resolved all of our claims. When it didn't, we had also requested that, in addition, that our plaintiff have the- No, no, I understand that you offered. Did they agree? No, no, they filed the- That's the point I'm trying to get at. No, they did not. All right. Thank you, counsel. Next up, Mr. Halberstadt. Good morning. May it please the court. Andy Halberstadt with Jackson Lewis on behalf of Hooters of America. This case is quite simple. It sure is. They've got no rights under that settlement agreement. It's been dismissed. The lawsuit's been dismissed. It expires in six months anyway. Other websites have this in it. This one doesn't. I don't understand why they don't have a lot of controversy against your client. They don't have a lot of controversy against my client, not at the time we filed the motion to dismiss, and they certainly don't have one today. And the reason for that is, this case is quite similar to one case- The reason they don't is that you've agreed to provide relief similar to the relief they're seeking. The difference, your honor, is that we're not agreeing to agree to provide relief. We have already provided the relief. No, you haven't. Your website isn't compliant unless you've made it compliant like the other development, the other case yesterday. We have made it compliant by the deadline that was required, number one, and number- No, no, no. I'm talking about at the time the district court dismissed this, it wasn't compliant. That's not entirely accurate, so- All right, let me ask you this. Compliant with what are you talking about? That's an excellent point, your honor. There is no current ADA standard requiring what websites, what standard they have to comply to. It doesn't exist. That's not- Okay, he's asking for a particular standard of compliance. Correct. If you're saying we don't have to do that, then we've got a very live controversy. If you're saying we do have to do that, then agree with him, get an injunction against you or consent decree for you to do it, and we're out of here. Yes, Judge, but we've done it. That's- Oh, you say we've done it. I'm looking at the trial judge's order in this case. Judge Scola doesn't say you've done it in the sense of completing it. What Judge Scola writes is that you've complied with the first phase of the remediation. No more, no less. As of the status and based on this record, isn't that correct? As of the date we filed a motion to dismiss- Based on the record we have in front of us. All we have is the first phase of remediation complete. No more, no less. Is that correct? It's not correct because we had more. We had- So Scola got it wrong? No, Scola got it right to that we had begun the process of implementation. What Judge Scola did not say is, although he had the website in front of him, we changed the website, right? So on date X, when Mr. Gomez sued, we had one website. That website doesn't exist anymore. That website also didn't exist as of the date that Judge Scola- The website that you have this afternoon, if I go in there and blindfold a law clerk and I pull up that website and I ask the law clerk, let's see how much an order of french fries cost. Can I click on that website and the website tell my law clerk who's blindfolded how much an order of french fries costs? Using a screen reader, is that the question? Using whatever the website provides. The lawsuit here is that he uses a screen reader that he's alleging the website is not compatible with. So the answer is if your law clerk was blindfolded and was using a screen reader, he can access and determine whatever the price of that french fries is. Where do we find that in this record? See, because that's not what Judge Scola said. Not even close to what he said. Well, because Judge Scola looked at the fact that- I understand why he did and what he did. I'm asking you and Judge Karnes has asked you, can you point me to a record citation that says in words or substance what you've just told Judge Karnes? We provided the website itself to the court, which the court is allowed to take judicial notice of. And we provided it to this court. I don't know how it's allowed to take judicial notice of it. I don't know that it's a fact so well known in the community and to the bench and bar that there's no reasonable dispute about it. You see, I would take adjudicative notice of the fact that the sun rose in Miami this morning on the 11th day of April at 642. I would not normally take adjudicative notice of whether or not the website was fully compliant or not. And I don't have any statement from the district court that it was. To the contrary, I have a statement from the district court that you've stepped down the road and you finished the first phase of remediation. No more, no less. That's what the district court finds if that's a finding of fact. OK, and I'm not saying you take judicial notice that the website is compliant. The judicial notice is that the website was changed, right? So that's that you began the process of changing, not that it was complete. Let me put the question in a different way. Let's just so suppose that's the state of the facts we have in front of us. OK, the district court said they began compliance. They took a substantial step. They did the first step of remediation. That's it. That's what's done. He says that's enough. Assume that's the state of the record. What remedy does Haynes have if Hooters backs off and says, you know what? We're not obliged to do this because we don't read the law as compelling it. And we're not going to do it anymore. Does he have any remedy? Yeah. What's his remedy? If we don't. How can he enforce the agreement in the Gomez case, not being a party to it? He's not a third party beneficiary. What standing or right of access would he have to the Gomez lawsuit? Well, given the fact that we actually began implementing the remediation before we were sued, all we asked the trial court was to hold that the case was moot until the end of the remediation period. It's not moot temporarily until you have a chance to moot it. It's not moot. If you'd ask the district court, stay this one. You got a bunch of cases in front of you. Just hold on to it a minute and we'll moot it. That's different. But the district court dismissed it as moot when it's not moot or was not moot. If we had not complied or if the remediation period ended and we didn't change the website. But you didn't say to Judge Scola, stay the case. We're not complete. We will be complete. Once we're complete, the story's over. There's no relief you can provide there. Right? You didn't do that, did you? I'll tell you why. You didn't do that, did you? I did not. And I'll explain why. So what you did do was move to dismiss, correct? That's exactly what we did. And he granted it? He did. Case closed. Non-justiciable. No right case or controversy. What remedy does Haynes now have if you back up on Gomez and don't provide the relief that you claim you will provide? Now that the remediation period is over, if we did not in fact do what we said we would, which we did do, he can sue us. Why should he have to start again? Start again from where? He's in the same place he was when he started. No, he isn't. He's out of court. He doesn't have a pending complaint. Assuming he has a pending claim. I mean, you can always say dismiss somebody, and if we don't do better in the future, then sue us again. The requirement that there be a live case or controversy means that the court has to be able to order something effective. And here's, to my mind, the critical factor here, and this is not disputed, this is an Mr. Bacon represented, and this is in the record, the following. He said, I would agree to the remedial measures and timing for revising the website that are in the Gomez settlement. I agree to everything you've done. Enter them in my case. But you didn't enter them in his case. Therefore, he has no right to seek enforcement of any of that. Well, then this opens up a question to, does every single ADA plaintiff can, and this is my example that I put in the motion, I think it's a critical policy point. Assuming that this was a service counter in front of your honors, and it was too high or too low. Okay. And the courthouse is sued, and they make a plan to remediate and to make it to the correct height. It takes more than a day to do it. You got to get a permit. Sure, I got that. So can everybody keep suing? The answer is absolutely they can. And you just stack them up. And after the relief has been entered, and they are truly moot because it's been lowered, then the district court deals with those others, dismisses them as moot, and denies attorneys fees because under the circumstance of the case, they didn't do anything. But that's not what happened in this case. I understand this is about attorneys fees at its core, but you can't call something moot just to handle that problem when it's not moot. That's a jurisdictional doctrine. And let me ask you one other thing. Regardless of what he offered as a matter of compromise and which was rejected, F, wherefore clause, F, that this court enter an order directing defendant to continually update and maintain its website to ensure that it remains fully accessible to and usable by visually impaired individuals. There's nothing in the agreement about that, in your Gomez agreement. There's nothing. He's asking for something that you haven't agreed to, even if he was somehow bound not to duplicate the relief in the Gomez agreement. That's not correct for two reasons. Number one, we agreed to change the website. I'm not saying change, an order directing defendant to continually update and maintain its website to ensure that it remains fully accessible. You could make it fully accessible next month and then two years from now, it's no longer fully accessible for whatever reason or whatever change in the internet or deterioration of your website or whatever. He's asking for relief that you didn't even agree to provide in Gomez, even if he were bound by Gomez. Well, two things. Number one, that assumes there's going to be updates or changes and that's- No, it just assumes that he's asking the court to order you to make any, should they be necessary. We see this all the time. Okay, but he didn't ask for that when he responded to me. It was an offer of what he would settle for and you said, no, thank you. You closed that door. Now he's here on his complaint and the order dismissing it as moot. The City of Dallas case, which we were asked to be prepared to discuss, addresses that very issue and says that if you've received the relief you want by virtue of a third party settlement agreement, because that's what this is. We have a third party. Everyone's looking at Gomez that he can enforce the agreement in Gomez, but Gomez will enforce that agreement. There are enforcement mechanisms there. Not necessarily. You all go to Gomez. Gomez comes to you. We got difficulties. It's slowing our website down. We sympathize with you. Would $50,000 make you give us a relief and go away, a release and go away? Gomez says, sure, but pay my lawyer. You pay his lawyer, you pay him. He's gone. He doesn't enforce the agreement. They're out of court, have to start all over again. Not in any functionally different spot than he was at the time this case was dismissed. Yes, he is. The time this case was dismissed, he's in court. He's no longer in court because it was dismissed. But he will be if he sues us again, assuming that there is a current barrier. Let me ask the question in a different way. Haines says that Hooters failed to satisfy its burden of proving mootness pursuant to the doctrine of voluntary secession. When we've looked at this question of voluntary secession, particularly with a private party, to determine whether or not a private actor will renege on, go back and do again, even assuming that he stopped doing it, we ask three questions. Question one, whether the challenge conduct was isolated or unintentional, as opposed to being ongoing and deliberate. I take it you would agree that this conduct was neither isolated nor unintentional, but rather was ongoing and deliberate. How can it be intentional when you're... Sheely had a website that performed in a certain way, did certain things, and didn't do other things? Yes, but that website... Do you think you've complied with that? It assumes that... Here's the difference from Sheely, right? And from other cases. In those cases, you have the black and white ADAG, the ADA Accessibility Guidelines, right? The Accessibility Guidelines are very clear. The grab bar has got to be this high, not this high. The toilet's got to be in this place and not that place. The ramp has to be this slope and not that slope. It's all very simple. Either you follow it or you don't. And if you... I understand that it's a work in progress, which is all that you're really saying. The third part of the test is whether the defendant acknowledges liability in the case and says, yeah, what we did, we did was wrong and we ain't going to do it again. In this case, if I read your pleadings correctly, you say quite the contrary. You're not renouncing Satan. You said we did what we had every right to do. We don't have to change a wit. We're doing it out of the goodness of our heart, not because the law requires us to do that. Isn't that right? Does that overstate your position? I think it does because... How does it overstate your position? Is it your position that you've acknowledged liability here? Or did you not say bricks and mortar are different from the website? And therefore, because this isn't bricks and mortar, we're not obliged. I think Your Honor is making a good point. And what I could have done, if Your Honor, with permission to end, I... Will you take your time and answer my question? We could have moved to dismiss and argued that websites are not covered by the ADA. And there's litigation all around the country on that very question. And then that's a question... I thought that's exactly what your position is. Absolutely not. We never took that position. That's the reason. I think that's why Judge Scola was moved by our genuineness when we said there was voluntary... You've acknowledged liability before Judge Scola? What we did was... Either you did or you didn't. You said, yeah, we're liable and we're changing it. Or we're not liable, but we're changing it anyway, because we think it's good business practice. It's the wise thing to do. We said we're not going to argue whether or not it's covered by the ADA. Do you think that's the same thing as an acknowledgement of liability as we've interpreted the voluntary secession doctrine? Well, as Judge Ungaro held in another decision post this case, how can a defendant acknowledge liability to a standard which doesn't exist? Liable that what? That we didn't... You could, for example, acknowledge that the ADA applies to your website. No court has yet determined that, not in the... I know that, but you could acknowledge it. You deny it. In your agreement, you specifically said defendant disputes the allegation set forth and denies that Title III of the ADA applies to its website, as its website is not a public accommodation as defined by Title III of the ADA. And even if Title III of the ADA applies to its website, further denies the website's in violation of Title III of the ADA. So you didn't acknowledge liability. You specifically denied it. Why can you not acknowledge it? Those are your words, aren't they? I can acknowledge that we didn't acknowledge the ADA applies. I didn't say we don't acknowledge the website was not WCAG compliant. I don't WCAG be WCAG'd. You said you have no legal obligation under the ADA to do anything to your website. That's what you said in the agreement I just read to you. I agree. Okay. You deny liability under the ADA for anything about your website. Because the position... To get the why, that factor cuts against you, counsel. I'm simply saying as we've interpreted voluntary secession, we look at three things. One, whether it's ongoing as opposed to a singular isolated act, and plainly the website was ongoing as opposed to a single isolated act. We look at whether or not there was an acknowledgement of liability under the ADA. You lose on that one. The only debatable one is the second one, whether the defendant's secession of the offending conduct was motivated by a genuine change of heart or mere avoidance of litigation. That one is debatable because you had a change of heart, but only in the course of litigation, but albeit it wasn't Haines litigation, it was Gomez's litigation. When I look at these factors, it looks to me that you can't even meet your burden under the voluntary secession doctrine. What am I missing there? Two things. Number one, you're assuming this is a voluntary secession case, and under the city of Dallas case... Why isn't it? Because we did it under compulsion of an enforceable settlement agreement with enforcement mechanisms. And the court in city of Dallas held, based on two decisions out of the Eighth Circuit and the Second Circuit, held that there is no voluntary secession when it doesn't occur mid-suit. Then let me ask just one final question. It's been asked before, but I want to be sure that I understand your answer to the question. Should Hooters decide they no longer wish to make this accommodation on their website? And you say, we can legally do that, at least in compliance with the ADA because it doesn't apply here. Should Hooters decide to do that? And should Gomez, for one reason or another, not go to court to enforce that agreement? He dies, or as Judge Karns puts it, they pay him off. Does Haynes have any remedy other than suing again, starting over? Can he use the Gomez resolution in any way to enforce his rights? No. Other than suing again? No. So he's shut out of court and has to start over. Yes, he's shut out of court and has to re-file. Doesn't that suggest to you that the case could not, by definition, be moot? Well, but the question is, what is the effective relief? That was this question you started the oral argument with when you asked Mr. Bacon. What is it that you want the court to order? Do you simply want the court to order, put the website into compliance, which you will agree is already being done? Is that what you want? Do we have courts . . . He offered to do that. You rejected it. Now you can't say, we take that offer and write it into his complaint. The complaint asks for additional relief. He offered to settle for less. You rejected it. That's not even first-year law school. That is just first-year common sense. You can't reject an offer to settle for less, and then argue that all he's entitled to, if you lose, is the less. We rejected the demand for attorney's fees. We didn't reject the remedial work, which we've done. All right. Thank you. We'll hear now from Mr. Bacon, three minutes. Just a few points, Your Honor. Let me ask you one preliminary question. Does the record reflect that they fully complied, changed their website, and brought it up to speed, or not? I'm sorry, the last question? Or not. Does it show that it hasn't . . . It does not reflect that. It reflects a first step and only a first step? A first step and only a first step. What does it not reflect? It doesn't reflect that it brought it into compliance with the second phase of the Sodom Agreement, and even the second phase of the Sodom Agreement would not have brought it into compliance with the industry standard, which is . . . What was the second stage of the remediation? The second stage of remediation, set out of paragraph five, simply says, while it recognizes the WCAG, an opposing counsel argued that that's vague and is not as set as, say, for example, the measurements of grant bars, which can be easily ascertained and measured, whereas he complained that there's no other industry standard, he recognizes it in paragraph five of the Sodom Agreement. Defendants shall use the WCAG 2.0, that is the recognized industry standard, but only as a guideline to improve accessibility. Well, they could use it as a guideline to improve accessibility if all they do is make the price of French fries readable on screen reader software, such as JAWS, and if they do nothing else, they have complied technically with this Sodom Agreement, which provides for far less than complete relief. I mean, Judge Scola's case required the defendant to . . . My recollection is Judge Scola's case in Winn-Dixie, which came up on appeal, but I assume was mooted because of the bankruptcy . . . It stayed, not mooted. . . . stayed, was that the defendant had to comply with the WCAG, and Judge Scola's opinion recognized that the WCAG 2.0 is the recognized industry standard. That's what we . . . Let me ask a question slightly differently. If we were to agree with you, the case isn't moot. I'm speaking for myself. It sure doesn't look moot to me. And we were to reverse and remand and say the case is justiciable. It went back to the district judge, and they were to come back and say, well, Judge, stay the case. We need not spend any money or time on discovery. We believe we're going to be able to show complete compliance in the other case, which I think, they will say, moots it out. But they seek a stay. Would you object to a stay? I'm just curious. We would object to a stay on several grounds. First of all, they were supposed to have been compliant with the prior settlement agreement as of September of last year. And they weren't. So . . . Is that your view? And they weren't. If they . . . Is it your view that they weren't compliant? It's my view they're not in compliance with the industry standard. If they simply . . . We're not talking about the industry standard. We're talking about the ADA. Simple question. Well, the ADA doesn't have any regulations . . . I know, but you have a position about whether they're in compliance with the ADA or not, or you wouldn't be in this lawsuit. Our position is that they are not. That's all we're asking. To comply with the prior settlement agreement . . . Bottom line, you don't have to waste any time. The bottom line is you wouldn't agree to a stay anyway. Correct. Okay. Before you sit down, Mr. Bacon, I want to ask you to do me a favor and read an opinion that Judge Johnson wrote. If you've got a pen, I'll give you the cite to it. If not, you can always get it off the recording. Brookhaven Landscape Case, 676 F. 2nd, 516. It's one of our decisions written by Judge Johnson, 82. And then even more importantly on rehearing, 681 F. 2nd, 734. It's still the same case. 681 F. 2nd, 734 about the responsibility of counsel representing appellant and appellee about the record in the lower court when they appear before the appellate court. This isn't a censure. This isn't a reprimand. This is just a suggestion for future purposes. We'll take that case under submission.